**APPALACHIAN POWER COMPANY, American Electric Power Company, Inc., Kentucky Power Company, Columbus and Southern Ohio Electric Co., Indiana & Michigan Electric Company, Ohio Power Company, Plaintiffs,**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA; Otis D. Casto, As a member of the Public Service Commission of West Virginia; Michael D. Greer, as a member of the Public Service Commission of West Virginia, Defendants.**

Civ. A. No. 85–0098.

United States District Court,
S.D. West Virginia,
Charleston Division.

Feb. 28, 1985.

---

Charles R. McElwee, William C. Porth, Charleston, W.Va., A. Joseph Dowd, Edward J. Brady, Kevin F. Duffy, Marsha R. Schermer, Columbus, Ohio, for plaintiffs.

Richard E. Hitt, Mark G. Thessin, Amy M. Lecocq, Billy Jack Gregg, Charleston, W.Va., for defendants.

## MEMORANDUM OPINION ON PRELIMINARY INJUNCTION ORDER

DENNIS R. KNAPP, Senior District Judge.

This case is presently before the Court on plaintiffs' Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure.

Plaintiffs seek injunctive relief preliminarily to enjoin the Public Service Commission of West Virginia (PSC) and its individual commissioners from enforcing and implementing a portion of a PSC order entered on December 28, 1984, in Case No. 83–697–E–42T, which (1) requires Appalachian Power Company (Appalachian) to submit to the PSC for its approval under the provisions of *W. Va. Code*, 24–2–12,[1] a transmission equalization agreement among Appalachian and four of its affiliated companies, all of which are subsidiaries of American Electric Power Company, Inc., and plaintiffs in this action, and (2) denies Appalachian recovery from its customers in West Virginia of $1.6 million in costs to be incurred under that agreement commencing January 22, 1985, until after the PSC has approved the agreement and has found the costs resulting therefrom to be reasonable for inclusion in Appalachian's rates.

The issues herein having been fully briefed and argued, the Court now makes its Findings of Fact and Conclusions of Law based upon the stipulation of facts signed by the parties and the testimony adduced at the hearing.

## FINDINGS OF FACT

1. The American Electric Power System consists of a parent holding company, American Electric Power Company, Inc. (AEP), and various subsidiary companies wholly owned by AEP. AEP's subsidiaries include, among others, five electric utility operating companies, Appalachian, Kentucky Power Company (KPC), Columbus and Southern Ohio Electric Company (C & SOE), Indiana & Michigan Electric Company (I & M), and Ohio Power Company (OPC) (collectively the "AEP System companies" or "members"). AEP and the System companies are the plaintiffs in this action.

2. Appalachian, a Virginia corporation, operates in the states of West Virginia and Virginia and is subject to regulation of its intrastate rates for retail electric service provided to customers in West Virginia by the defendant PSC.

3. AEP, KPC, C & SOE, I & M and OPC are, respectively, New York, Kentucky, Ohio, Indiana and Ohio corporations and none is subject to the regulatory jurisdiction of the defendant PSC. The four last-named companies operate as electric utilities exclusively in the states in which they are incorporated except that I&M also operates as an electric utility in Michigan. The AEP System operating companies, including Appalachian, supply electric energy to residential, commercial and industrial customers and public authorities collectively in seven states, including Appalachian in its twenty-one county service area in Southern West Virginia.

4. Defendant PSC was established by the Legislature of West Virginia with power to sue and be sued, and under the provisions of Chapter 24 of the Code of West Virginia has regulatory jurisdiction over the intrastate activities of Appalachian in West Virginia. Defendants Otis D. Casto and Michael D. Greer, the new Chairman of the PSC, are members of and presently constitute the PSC and were members of

---

**1.** Which provides in pertinent part:

Unless the consent and approval of the public service commission of West Virginia is first obtained: ... (f) no public utility subject to the provisions of this chapter ... may, by any means, direct or indirect, enter into any contract or arrangement for management, construction, engineering, supply or financial services or for the furnishing of any other service, property or thing, with any affiliated corporation, person or interest; ....

the Commission at the time it issued its order of December 28, 1984, in PSC Case No. 83-697-E-42T. The third membership on the PSC was recently filled by Charlotte Lane.

5. The AEP System companies are parties to an Interconnection Agreement, dating back to July 6, 1951, which was designed to provide customers of members of the AEP System the benefits and advantages of large scale, coordinated operation and planning of electric supply facilities owned by, or available to, member companies. One of the features of this agreement is a primary capacity equalization charge. This charge fixes the rate at which AEP System companies purchase electric generating capacity from each other to supplement the generating capacity of their own systems to meet customer demands and reserve requirements. AEP System companies with generating capacity deficits make payments to those companies with surplus generating capacity in amounts in accordance with the methodology in the Interconnection Agreement. Thus, that Agreement essentially provides for an equalization of the AEP System companies' investment in electric generation facilities.

6. The electric generation facilities and load centers of the AEP System companies are interconnected by means of an extensive interstate network of transmission lines. The interconnection of said generation facilities allows them to be planned and operated as a single, fully integrated electric system. This interstate network of transmission lines traverses the extensive geographic area in which the AEP System companies operate and stretches some 400 miles from the Illinois border in the west to the Pennsylvania border in the east, and some 500 miles from Southwest Michigan in the north to the North Carolina border in the south. Not only does this network of transmission lines tie together the various generating plants and load centers of the AEP System companies, but it also makes possible 142 interconnections with 25 unaffiliated utilities as of January 1, 1985.

7. Each of the five major AEP System companies owns and maintains that part of the AEP System interstate network of transmission lines that is physically located in its state or designated area, and with a single exception of one transmission line located in Indiana, the financial responsibility for each mile of this interstate network of transmission lines has been borne by the AEP System member in whose state or designated area the transmission facilities are located.

8. The disparity between the amount of investment made by each AEP System company in the Extra High Voltage (345 KV, 500 KV, and 765 KV) (EHV) transmission network and the usage of that network by each such company has grown in recent years and is expected to grow in the future. Because of the AEP System companies' belief that fairness requires that they should begin to equalize the costs associated with ownership and operation of the AEP System interstate network of EHV transmission facilities by sharing the total cost of that System through appropriate monthly equalization payments under a concept of having its responsibility in proportion to its maximum load, similar to the equalization of the AEP System companies' investment in electric generation facilities as embodied in the Interconnection Agreement, the AEP System members entered into a Transmission Agreement, dated April 1, 1984 (the "Transmission Agreement").

9. The Transmission Agreement provides an equalization formula whereby each AEP System member having an investment in EHV transmission facilities (facilities operating at 765 KV, 500 KV or 345 KV) greater than its Member Load Ratio (MLR)[2] share of the total system EHV investment will be reimbursed for its "surplus" investment by those "deficit" members (including Appalachian) having an

2. A member's MLR in any month is the ratio of its maximum demand during the previous 12-month period to the sum of all members' maximum demands during that same period.

investment less than their MLR share of the total system EHV investment.

10. The Transmission Agreement provides for a five-year phase-in for such equalization payments so that in the fifth year all of the parties to the Transmission Agreement will be carrying and will continue thereafter to carry their full MLR share of the total AEP System investment in EHV transmission facilities as calculated by AEP. The five-year phase-in was considered necessary by the parties to the Transmission Agreement to soften the financial and rate impact that otherwise would be immediately imposed on the deficit companies (including Appalachian) which would be required to make payments to the surplus companies under the Agreement.

11. On March 29, 1984, the Transmission Agreement was filed with the Federal Energy Regulatory Commission (FERC) in Docket No. ER84–348–000 (later renumbered and hereinafter referred to as ER84–348–001). A copy of the filing was served upon the PSC as required by the Federal Power Act (16 U.S.C. § 824a).

12. By order of August 21, 1984, in Docket No. ER84–348–001, the FERC accepted the Transmission Agreement for filing as a rate schedule, with the terms and conditions being suspended for five months, to become effective on January 22, 1985, subject to refund. Hearing on the matter of the justness and reasonableness of the Transmission Agreement was scheduled to commence on February 5, 1985.

13. Notice of the filing was made in the Federal Register with responses and notices to intervene due on or before April 23, 1984. The PSC and the Consumer Advocate Division of the PSC (CAD) filed separate interventions in FERC Docket No. ER84–348–001. Various groups and public bodies located in other states in the AEP service area also have intervened, including the utility regulatory commissions of Virginia, Ohio, Kentucky and Michigan, as well as publicly-funded consumer advocates in each of those states. In addition, wholesale customer groups from the states of Indiana and Ohio have intervened, as have representatives of industrial customers from the states of Kentucky and Virginia.

14. Pursuant to the procedural schedule established by the Administrative Law Judge in FERC Docket No. ER84–348–001, the PSC has in its intervenor status in that docket filed testimony and a pretrial brief with the FERC.

15. In its testimony and pretrial brief filed with the FERC, the defendant PSC has stated its total opposition to the Transmission Agreement and has characterized the Transmission Agreement as being unreasonable, unfair and unwarranted, and has urged the FERC to reject the Agreement. The PSC in its order of September 28, 1984 in its Case No. 83–697–E–42T stated that it was opposed to the concept embodied in the Transmission Agreement and that it had intervened in the FERC proceeding "to fight it."

16. The testimony filed on behalf of the various intervenors in FERC Docket No. ER84–348–001 takes exception to elements of the Transmission Agreement on the grounds that they impose excessive cost responsibilities on the particular AEP operating company which provides service in the area where the particular intervenor is located or with which it is concerned. All of the state regulatory agencies which have submitted testimony in the FERC proceeding (being the utility regulatory commissions of Ohio, Michigan and West Virginia which have regulatory authority with respect to the intrastate rates of OPC, C & SOE, I & M and Appalachian in their respective jurisdictions) have charged that the Transmission Agreement, or proposed modifications thereof, favor AEP System Company ratepayers living in other states at the expense of their own AEP System Company ratepayers, and some have gone so far as to accuse other state regulatory agencies of being unable to place the principles of fairness and equity above their own parochial interests.

17. Subsequent to the FERC's order of August 21, 1984, in its Docket No. ER84–348–001, the defendant PSC issued an or-

der on September 28, 1984 in its Case No. 83–697–E–42T, which case was initiated by Appalachian by a rate increase filing made on December 5, 1983. In its September 28, 1984 order, the PSC concluded that it had no authority under *W. Va. Code,* 24–2–12, to require Appalachian to submit the Transmission Agreement to the PSC for its approval or to deny Appalachian recovery of its costs to be incurred thereunder commencing January 22, 1985 per the FERC order of August 21, 1984, in FERC Docket No. ER84–348–001. Accordingly, the PSC in its order of September 28, 1984, included $1.6 million in Appalachian's rates to be effective on January 22, 1985, so as to allow Appalachian to commence recovery of some of its costs to be incurred under the Transmission Agreement, which order was subject to certain conditions including refund protection.[3]

18. On October 9, 1984, the CAD filed with the PSC a Petition for Reconsideration, Rehearing, Reargument and Clarification of its final order of September 28, 1984. Therein, the CAD argued without citing any authority that the PSC was wrong in its analysis in that the PSC could require approval of the Transmission Agreement under the provision of *W. Va. Code,* 24–2–12. The PSC eventually agreed, and its order of December 28, 1984, reversed in part its earlier decision of September 28, 1984, by requiring Appalachian to submit the Transmission Agreement to the PSC for approval under the provisions of *W. Va. Code,* 24–2–12, and further denied to Appalachian recovery of $1.6 million in costs previously allowed by the September 28, 1984 order under the terms of the Transmission Agreement unless and until Appalachian submits the Transmission Agreement to the PSC for its approval under *W. Va. Code,* 24–2–12, and the PSC grants such approval and finds the costs

resulting from the Transmission Agreement to be reasonable.

19. The PSC, by reserving unto itself in its order of December 28, 1984, in case No. 83–697–42T, a decision-making role as to whether the terms and conditions of the Transmission Agreement are reasonable under the provisions of *W. Va. Code,* 24–2–12, and whether to allow Appalachian cost recovery thereunder, after having advocated before that federal agency that the Transmission Agreement is unwarranted, unfair, and unreasonable, has and will deprive the plaintiffs, particularly Appalachian, of an impartial and disinterested tribunal. Plaintiffs' Civil Rights claim set forth in Count V of their Complaint is ripe for decision and plaintiffs have alleged material facts to support their claim.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1337, 1343, 2201 and 2202 and 42 U.S.C. § 1983, and the complaint states claims upon which relief can be granted.

■ 2. The Court is not prevented by the Johnson Act of 1934 (28 U.S.C. § 1342) from exercising jurisdiction of this action for the following reasons:

(a) The required submittal is not an order "affecting rates chargeable by a public utility."

(b) The Johnson Act of 1934 applies only when all four conditions of that Act are met. See, *Aluminum Co. of America v. Utilities Commission of North Carolina,* 713 F.2d 1024 (4th Cir. 1983). Since plaintiffs "have based jurisdiction upon federal questions, preemption and impermissible interference with interstate commerce," the first condition of the Johnson Act is not met because "jurisdiction is not based solely on diversity . . . or repugnance . . . to the

---

**3.** The PSC's September 28, 1984, order in Case No. 83–697–E–42T states (p. 53) that "the stipulation [among all parties of record except the Consumer Advocate Division of the PSC] provides that . . . once [the $1.6 million is included] in APCO's (Appalachian's) rates, if FERC later reduces the allowed cost, Apco will not only

return to its West Virginia customers the difference between the amounts already collected and the amount finally approved but also will immediately reduce its retail rates to reflect the appropriate amount. (Stipulation, pp. 20–22)." As regards the $1.6 million, Appalachian considers itself bound by this refund provision.

federal constitution." *Id.* at 1028; *Cabot Corporation v. Public Service Commission of West Virginia*, 332 F.Supp. 370 (S.D.W.Va.1971). Furthermore, plaintiffs' civil rights claim under 42 U.S.C. § 1983 that they, and Appalachian in particular, have been and will be deprived of an impartial, disinterested tribunal guaranteed by the Fourteenth Amendment of the United States Constitution is not directed to a PSC order "affecting rates chargeable by a public utility;" and since jurisdiction of that claim is based upon federal statute, the first condition of the Johnson Act is not met because "jurisdiction is not based solely on diversity ... or repugnance ... to the federal constitution." Plaintiffs have alleged that the PSC's required submittal and denied recovery "interfere with interstate commerce which, if proven, would defeat the second condition of the Johnson Act." *Aluminum Co. of America*, supra at 1028. The third condition of the Johnson Act is not met because the submittal requirement of the PSC's order was not made after reasonable notice to and hearing opportunity for plaintiffs. The fourth condition of the Johnson Act is not met because plaintiffs, other than Appalachian, have no right to appeal the PSC's December 28, 1984 order to the Supreme Court of Appeals of West Virginia. *W.Va.Code*, 28–5–1.

■ 3. The abdication by this court of its obligation to decide this case can be justified under an abstention doctrine only in the exceptional circumstances where the order to the parties to repair to a state court would clearly serve an important countervailing interest. *Moses H. Cone Hospital v. Mercury Construction Corporation*, 460 U.S. 1, 14–15, 103 S.Ct. 927, 936–937, 74 L.Ed.2d 765, 779 (1983); *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

■ 4. This court cannot under any of the abstention doctrines exercise its judicial discretion to dismiss this action merely because a state court could entertain it, and even the pendency of an action in a state

court is no bar to proceedings concerning the same matter in this Court because "... the federal courts have a virtually unflagging obligation ... to exercise the jurisdiction given them." *Colorado River Water Conservation District v. United States*, 424 U.S. at 817, 96 S.Ct. at 1246, 47 L.Ed.2d at 498; *Moses H. Cone Hospital v. Mercury Construction Corporation*, 460 U.S. at 15, 103 S.Ct. at 936, 74 L.Ed.2d at 779 (1983).

■ 5. This Court is not justified in abstaining from exercising its jurisdiction over this action by any of the recognized doctrines of abstention.

(a) *Pullman* abstention (*Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) ) is not appropriate with regard to either the federal preemption or civil rights claims because there is no unsettled state law question which must be resolved before a federal constitutional question can be decided or the resolution of which could moot a federal constitutional issue. *Hawaii Housing Authority v. Midkiff*, —— U.S. ——, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984).

(b) *Younger* abstention (*Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), as embellished in *Middlesex Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982) ) is not appropriate with regard to either the federal preemption or civil rights claim because: (1) neither involves a state interest which relates to the health, safety and morals of the state's population; (2) the source of the determining law is federal; (3) federal interests (preemption and due process) far outweigh whatever state interests are involved; and (4) only Appalachian, and not the other plaintiffs, may appeal the PSC's order to the Supreme Court of Appeals of West Virginia. *W.C.M. Window Co., Inc. v. Bernardi*, 730 F.2d 486 (7th Cir.1984); *Kruse v. Snowshoe Company*, 715 F.2d 120 (4th Cir.1983); *Baggett v. Dept. of Professional Regulation*, 717 F.2d 521 (11th Cir.1983); *Empire, Inc. v. Ashcroft*, 524 F.Supp. 898 (W.D.Mo.1981). See, *Gibson v.*

*Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), as to the Civil Rights claim.

(c) *Burford* abstention (*Burford v. Sun Oil Company,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943)) is not appropriate with regard to the civil rights claim because: (1) it is not a local issue arising out of a complicated state regulatory scheme; and (2) the state appellate court does "not stand in any special relationship of technical oversight or concentrated review" to that issue. *Educational Services, Inc. v. Maryland State Board for Higher Education,* 710 F.2d 170 (4th Cir.1983); *International Brotherhood of Electrical Workers v. Public Service Commission,* 614 F.2d 206 (9th Cir.1980).

Neither is *Burford* abstention appropriate with regard to the federal preemption claim because (1) there is a direct, facial conflict between Part II of the Federal Power Act and *W.Va.Code,* 24–2–12 (the FERC and the PSC would be deciding identical issues with respect to the Transmission Agreement; See, Conclusion of Law No. 16, *infra* ); (2) the PSC's December 28, 1984 order does not on its face set only retail, intrastate rates; (3) evaluation of the preemption claim would not involve detailed factfinding because *W.Va.Code,* 24–2–12, is in direct, not indirect conflict, with Part II of the Federal Power Act; (4) there can be no impartial and fair administrative determination in the state regulatory scheme concerning any possible state policy; and (5) there is no state court possessing any special competence to decide the federal issues at hand which exceeds the competence of this court. *Aluminum Co. of America,* 713 F.2d at 1029–30.

(d) Exceptional circumstance abstention (*Colorado River Water Conservation District v. United States,* supra) is not appropriate with regard to either the federal preemption or civil rights claim because there has been no assumption by a state court of jurisdiction over property, the federal forum is not less convenient to the parties than any state forum, the assumption of federal jurisdiction would not result

in piecemeal litigation, and the source of law which will decide the outcome of this case is federal not state. *Kruse v. Snowshoe Co.,* 715 F.2d 120 (4th Cir.1983).

■ (e) Where, as here, the state regulatory body is not a disinterested, impartial tribunal, the Court may not order an abstention dismissal even though a state judicial review, de novo or otherwise, would be forthcoming at the end of the administrative proceedings. *Gibson v. Berryhill,* supra.

6. The recovery denied by the PSC in its order of December 28, 1984, in Case No. 83–697–E–42T, has and will cause Appalachian immediate and irreparable harm. If the FERC finally approves the financial arrangement under the Transmission Agreement and if the PSC's order of December 28, 1984 in this particular is ultimately determined to be invalid, there would exist considerable doubt as to whether the PSC at a later date could lawfully authorize Appalachian subsequently to recover through its West Virginia retail rates its costs theretofore incurred under the Transmission Agreement.

7. If the Court were to enjoin defendants preliminarily from enforcing or implementing the denial of recovery by Appalachian of the $1.6 million in costs which Appalachian will incur commencing January 22, 1985, and reinstate the PSC's September 28, 1984, order, there would be no resulting harm to defendants and any harm to Appalachian's customers would be *de minimis,* in that Appalachian has made the commitment that, if the final judicial decision in this case *and* the PSC order on a *W.Va.Code,* 24–2–12, review of the Transmission Agreement are against the positions of plaintiffs and of Appalachian, it (Appalachian) will refund to its customers with interest as fixed by the Court such part of the $1.6 million as they have paid. The Court fixes that interest at 11%, which is the prime lending rate at the Charleston National Bank as of February 8, 1985.

8. The required submittal, which the Court finds is an issue ripe for decision, will cause plaintiffs immediate and irrepa-

rable harm in that, if allowed to stand, it will create grave uncertainty about whether the Transmission Agreement has or can become effective as to Appalachian until the PSC has granted its consent and approval of Appalachian to enter into and become a party to the Transmission Agreement. More particularly, that uncertainty will have the following immediate consequences, all of which demonstrate compelling and urgent need for issuance of the preliminary and permanent injunction requested in the complaint:

(a) If the Transmission Agreement is not or cannot become effective as to Appalachian without the PSC approval, the Agreement is rendered inoperative for the entire AEP System, and to that extent the PSC's order of December 28, 1984, would have the effect of repealing the Federal Power Act;

(b) It creates grave uncertainty for plaintiffs in their conduct of the affairs of the AEP System on a continuing day-to-day basis; and

(c) It creates grave uncertainty for plaintiffs in their planning of the future construction or extension of EHV transmission lines.

9. If the Court were to enjoin defendants preliminarily from enforcing or implementing the required submittal, there would be no harm to defendants or to Appalachian's West Virginia customers since the PSC and the Consumer Advocate Division of the PSC are both intervenors in FERC Docket No. ER84-348-001 representing the interests of Appalachian's West Virginia customers in the proper forum and have made and can make such advocacy in that proceeding as they deem advisable in the interest of those customers as to why the Transmission Agreement should be rejected or modified by the FERC, an impartial tribunal.

10. To require Appalachian to submit the Transmission Agreement and its cost recovery thereunder to the PSC, which by its advocacy before the FERC in Docket No. ER84-348-001 has demonstrated that it has prejudged the facts and rendered it a partial, interested tribunal, for purposes of review of the Transmission Agreement, would cause Appalachian immediate and irreparable harm if such requirement of the PSC is not enjoined, whereas there would be no harm to the defendants or to Appalachian's customers since, as noted *supra*, the PSC and the Consumer Advocate Division of the PSC are both intervenors in FERC Docket No. ER84-348-001 representing the interests of Appalachian's West Virginia customers in the proper forum and have made and can make such advocacy in that proceeding as they deem advisable in the interest of those customers as to why the Transmission Agreement should be rejected or modified by the FERC, an impartial tribunal.

11. Defendants presented no evidence that either they or Appalachian's customers would be harmed if a preliminary injunction were issued. The substantial and immediate injury that will be sustained by Appalachian should the Court not preliminarily enjoin defendants from enforcing or implementing the submittal required and the recovery denied outweigh any possible harm to defendants or to anyone else should defendants be so preliminarily enjoined. Under the balance-of-hardship test which this Court applies under Rule 65 of the Federal Rules of Civil Procedure, there is a much greater hardship on plaintiffs, particularly Appalachian, than on the defendants or other interested parties.

12. The proper tests to be applied in this case to determine if plaintiffs have justified the issuance of a preliminary injunction are those set forth in *Blackwelder Furniture Co. v. Seilig Manufacturing Co., Inc.*, 550 F.2d 189 (4th Cir.1977), See, *The Chesapeake and Potomac Telephone of Maryland v. Public Service Commission of Maryland*, 748 F.2d 879 (4th Cir. 1984); namely, the balance-of-hardship test and the likelihood-of-success test, together with a consideration of the public interest.

■ 13. If in applying the balance-of-hardship test, the result is in favor of plaintiffs as the Court has found, it is enough

that plaintiffs have presented grave or serious questions and they need not show a likelihood of success. *Blackwelder,* 550 F.2d at 196. The Court concludes that plaintiffs have presented in their complaint grave or serious questions.

14. If the Court has erred in its finding that in applying the balance-of-hardship test the result is in favor or plaintiffs, and that plaintiffs will only possibly suffer irreparable injury if a preliminary injunction is not granted, the issuance of a preliminary injunction as prayed for by plaintiffs is warranted because of the strong probability of plaintiffs' success on the merits. *Blackwelder,* 550 F.2d at 196. That probability includes consideration of the public interest which motivated Congress to provide for the federal regulation of the transmission of electric energy in interstate commerce. Federal Power Act, § 201(a) [16 U.S. § 824(a)].

15. The involvement of the public interest has on occasion caused courts to "go much further both to give and withold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginia R. Company v. System Federation,* 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789, 802 (1937); *Yakus v. United States,* 321 U.S. 414, 441, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944); *Virginia Surface Mining and Reclamation Association, Inc. v. Andrus,* 604 F.2d 312, 315 (4th Cir.1979); *Texaco, Inc. v. Hughes,* 572 F.Supp. 1, 3 (D.Md.1982). In granting the preliminary injunction as prayed for by the plaintiffs, the Court is furthering the public interest which Part II of the Federal Power Act has provided for in vesting the FERC with regulatory authority over the transmission of electric energy in interstate commerce.

16. Plaintiffs have demonstrated a likelihood that they will ultimately prevail on the merits of the claims which they have asserted in this action. It appears to the Court at this preliminary stage of this action that:

(a) The submittal of the Transmission Agreement to the PSC required by the PSC's order of December 28, 1984 has been preempted by Part II of the Federal Power Act in that the only determinations of reasonableness, undue advantage to any party, and public interest which the PSC is empowered to make under *W. Va. Code,* 24–2–12, (*United Fuel Gas Co. v. Public Service Commission,* 154 W.Va. 221, 174 S.E.2d 304 [1970]) will be made by the FERC in its more comprehensive determinations of justness and reasonableness, undue advantage or disadvantage to any person, and public interest. Federal Power Act §§ 205(a), (b), and (c), and 206 [16 U.S.C. §§ 824d and 824e]; *Pennsylvania Power and Light Co.,* 23 FERC ¶ 61,325 (June 2, 1983); Testimony of various parties to the FERC proceedings. See also, *Public Service Commission of West Virginia v. The Federal Power Commission,* 437 F.2d 1234 (4th Cir.1971); *Cabot Corporation v. Public Service Commission of West Virginia,* 332 F.Supp. 370 (S.D.W.Va. 1971).

(b) The PSC's December 28, 1984 denial of recovery of the transmission equalization costs which it had approved in its order of September 28, 1984 is an impermissible infringement on the FERC's exclusive authority to regulate the transmission and sale of electric energy in interstate commerce.

(c) The PSC's attempt to exercise an incompatible dual function of advocate before the FERC and decisionmaker in state administrative proceedings has deprived plaintiffs of their due process right to adjudication before an impartial, disinterested administrative body.

Accordingly, the Court is of the opinion that plaintiffs are entitled to the injunctive relief sought herein.