NEW ORLEANS PUBLIC SERVICE, INC., Plaintiff–Appellant,

v.

THE COUNCIL OF the CITY OF NEW ORLEANS, et al., Defendants–Appellees.

No. 88–3194.

United States Court of Appeals, Fifth Circuit.

July 28, 1988.

---

Herschel L. Abbott, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Thomas O. Lind, Vice-President, Regulatory Counsel, NOPSI, New Orleans, La., for plaintiff-appellant.

Okla Jones, II, City Atty., Council Utility Regulatory Office, Bruce E. Naccari, Beverly Zervigon, Asst. City Attys., Walter J. Wilkerson, New Orleans, La., Clinton A. Vince, Bernhardt K. Wruble, Nancy Wodka, McPherson & Hand, Washington, D.C., for defendants-appellees.

Before RUBIN, GARZA and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

In 1986 this court decided that a federal district court had not abused its discretion in abstaining from deciding federal issues presented in suit to enjoin a state agency's proceeding to fix the retail rates that might be charged by a public utility. Bound by this decision, we hold again that the same district court did not abuse its discretion in failing to take jurisdiction over issues of federal law at a later stage of the same proceeding.

I.

This is the fourth federal court battle in a legal war that began almost a decade ago. New Orleans Public Service, Inc. (NOPSI), a subsidiary of Middle South Utilities, Inc., a public utility holding company, sells electric power to consumers in the City of New Orleans. It continues to seek a federal forum for its claims against the New Orleans City Council, which by state law fixes the utility rates charged consumers in New Orleans. It charges that the Council is violating federal law by preventing NOPSI from passing on to the consumers all of the costs of NOPSI's purchase of power generated by a nuclear reactor at rates fixed by the Federal Energy Regulatory Commission (FERC).

Middle South owns and therefore controls Louisiana Power & Light Co., Mississippi Power & Light Co., Arkansas Power & Light Co., and NOPSI, collectively known as the Middle South Companies, all of which are engaged in distributing energy, as well as System Energy Resources, Inc. (SERI), which generates energy. In the late 1960's, Middle South sought to meet projected increases in demand and to diversify the fuel base of its entire system by adding coal and nuclear generating units. Because Middle South found it im-

practical for each of the four operating companies to finance and construct a nuclear power facility, it formed a new subsidiary, Middle South Energy, Inc. (MSE), a corporate predecessor of SERI, to finance, own, and operate two nuclear reactors, Grand Gulf I and II. Middle South later decided for economic reasons not to build Grand Gulf II, but to proceed with the construction of Grand Gulf I, a 1250 megawatt nuclear generating plant. In 1974, NOPSI, Louisiana Power, Mississippi Power, and Arkansas Power all committed themselves to sharing the construction costs of Grand Gulf, which MSE projected to be $875 million.

After the nuclear disaster at Three Mile Island, federal regulatory authorities adopted stricter regulations for the construction of nuclear plants. As a result of this and other factors, construction of the Grand Gulf nuclear plant took longer and became drastically more expensive than originally anticipated, amounting in the end to $3.6 billion. Consequently, the wholesale cost of power produced at Grand Gulf greatly exceeds that of power produced in other system facilities. Moreover, even as Grand Gulf was under construction, it became clear that the demand for its energy would be less than originally anticipated.

In 1982, the Middle South Companies submitted two agreements to FERC, which has exclusive jurisdiction over interstate wholesale power rates.[1] The first was a new System Agreement, which set forth the terms and conditions for coordinated operations and wholesale transactions among the four companies, including a scheme of capacity equalization payments, which were designed to ensure that each company contribute proportionately to the total costs of generating power for the system. The second was a Unit Power Sales Agreement, which provided wholesale rates for the sale of Grand Gulf capacity and energy to the operating companies. The Unit Power Sales Agreement allocated 29.8% of the Grand Gulf costs to NOPSI.

---

1. 16 U.S.C. § 824(b) (1982); *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 956, 106 S.Ct. 2349, 2352, 90 L.Ed.2d 943 (1986); *see also* 16 U.S.C. §§ 824d, 824e (1982).

FERC assigned each agreement to a different administrative law judge, charging them with the task of determining whether the agreements were "just and reasonable" within the meaning of the Federal Power Act.[2] Each ALJ held extensive hearings, in which numerous parties representing consumer interests and the various state regulatory agencies participated. At these hearings, the New Orleans City Council appeared in order to protest the proposed rates and the allocations made pursuant to the Sales Agreement. The City Council and other utility regulatory bodies argued that FERC should reduce the allocations of the high-cost and hence relatively unattractive nuclear power to their constituents.

Three years later, in 1985, FERC issued an order modifying the Sales Agreement to provide for the allocation of power and costs from Grand Gulf as follows: 17 percent to NOPSI, 14 percent to Louisiana Power, 33 percent to Mississippi Power, and 36 percent to Arkansas Power.[3] As the Supreme Court noted in *Mississippi Power & Light Co. v. Mississippi ex rel. Moore,*[4]

> [FERC] did not expressly discuss the "prudence" of constructing Grand Gulf and bringing it on line, [but it] implicitly accepted the uncontroverted testimony of the [Middle South] executives who explained why they believed the decisions to construct and to complete Grand Gulf I were sound, and approved the finding that "continuing construction of Grand Gulf Unit No. 1 was prudent because Middle South's executives believed Grand Gulf would enable the Middle South system to diversify its base load fuel mix and, it was projected, at the same time,

produce power for a total cost (capacity and energy) which would be less than existing alternatives on the system."[5]

The state regulatory agencies appealed the FERC allocations, and the United States Court of Appeals for the District of Columbia Circuit reversed the FERC decision.[6] On remand, however, FERC reaffirmed its original 1985 allocations.[7]

NOPSI appealed to the New Orleans City Council in 1985 for a retail rate increase to cover the increase in wholesale costs that the FERC order would require it to pay. The Council responded with a resolution initiating an investigation into "all aspects of NOPSI's prudence regarding its decisions to enter into its arrangements to purchase a portion of Grand Gulf 1 for the purpose of determining what portion, if any, of NOPSI's Grand Gulf 1 expense shall be assumed by its shareholders, rather than passed through to its retail ratepayers" (the Prudence Resolution). The Council also refused to approve the rate increase pending the outcome of this investigation.

While the Council was conducting its prudence inquiry, the Supreme Court decided *Nantahala Power & Light Co. v. Thornburg,*[8] a case that came to the Court on appeal from a state supreme court decision. In *Nantahala,* the Court held that FERC has exclusive jurisdiction over interstate wholesale power rates, and once it has allocated wholesale power, a state regulatory body may not refuse to recognize that allocation. This is a necessary consequence of the filed rate doctrine, which prescribes that interstate power rates filed with or fixed by FERC must be given binding ef-

---

**2.** 16 U.S.C. § 824(a) (1982).

**3.** Opinion and Order Setting Just Reasonable and Non-Discriminatory Rates, 31 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,305 (June 13, 1985) (Opinion No. 234).

**4.** ___ U.S. ___, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).

**5.** *Id.* at ___, 108 S.Ct. at 2434 (quoting Middle South Energy, Inc., 26 Fed. Energy Reg. Comm'n Rep. (CCH) at ¶¶ 65,112–65,113 (1984)).

**6.** *Mississippi Indus. v. FERC,* 822 F.2d 1104 (D.C. Cir.), *cert. denied,* ___ U.S. ___, 108 S.Ct. 501, 98 L.Ed.2d 499 (1987).

**7.** System Energy Resources, Inc., 41 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,238 (Nov. 30, 1987) (Opinion No. 292).

**8.** 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986).

fect by state utility commissions determining intrastate rules.

After the City Council had refused to approve its requested rate increase, NOPSI sought a federal court injunction requiring the Council to pass through, immediately and fully, the increased costs of Grand Gulf to ratepayers and to prevent the Council from conducting its prudence inquiry. The district court dismissed the suit, holding that it lacked subject matter jurisdiction and that, even if it had jurisdiction, it should abstain. While an appeal to this court was pending, in March, 1986, the City Council and NOPSI reached a partial settlement of NOPSI's application for a rate increase. NOPSI agreed to absorb $51.2 million of the costs of Grand Gulf. The Council allowed NOPSI to make a phased interim rate increase, to which NOPSI agreed, in order to moderate the effects of "rate shock" on New Orleans ratepayers. Both parties agreed, however, that this settlement did not affect the Council's continuation of its prudence inquiry.

In *NOPSI I,* this Court initially reversed both district court rulings,[9] but on rehearing affirmed the district court's decision to abstain, in order to avoid interfering with a comprehensive state regulatory scheme.[10] The district court relied upon this opinion, which we will discuss again in detail, in its decision to abstain from hearing the present case.

In April, 1987, the City Council completed its hearings and began deliberations. NOPSI again sought an injunction from the federal district court, arguing that the Council was unreasonably delaying a decision and that its inquiry encroached on areas of exclusive FERC jurisdiction. Later amending its complaint, NOPSI sought only an injunction against any action by the Council that would force NOPSI's share-

holders to absorb part of the costs of Grand Gulf that FERC had allocated to NOPSI. NOPSI contended that the announced purpose of the Council's prudence inquiry intruded upon an area within FERC's exclusive jurisdiction. When the district court decided both that the case was not ripe for decision and that, even if it was, it should abstain, NOPSI appealed to this court.

In *NOPSI II,*[11] this court once again noted that the Federal Power Act gives FERC exclusive authority to regulate the wholesale sale of power in interstate commerce while allowing the states to retain their traditional police power to regulate intrastate retail sales. The *NOPSI II* opinion recognized that the Prudence Resolution and the subsequent Council hearing could "certainly be interpreted as directed toward areas now off-limits to state regulators."[12]

The opinion, however, further recognized that the Council's inquiry presented "only a *possibility* of harm to NOPSI. If such harm occurs, the validity of the New Orleans City Council's action will depend on facts not yet in existence."[13] NOPSI would suffer no irreparable harm pending completion of the prudence inquiry. Therefore the injunction issue was not yet ripe, and the Court found it unnecessary to address the district court's alternative decision to abstain.

After completing the lengthy prudence inquiry, the Council adopted a rate order on February 4, 1988. The order disallows $135 million of NOPSI's deferred Grand Gulf costs and requires NOPSI to write this sum off its rate base. It also reduces NOPSI's rate increases, planned to begin on April 9, to reflect this disallowance. The Council based its actions on these conclusions:

**9.** *New Orleans Pub. Serv., Inc. v. City of New Orleans,* 782 F.2d 1236 (5th Cir.1986), *modified,* 798 F.2d 858 (5th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987).

**10.** *New Orleans Pub. Serv., Inc. v. City of New Orleans,* 798 F.2d 858 (5th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1910, 95 L.Ed.2d 515 (1987).

**11.** *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 833 F.2d 583 (5th Cir.1987).

**12.** *Id.* at 586.

**13.** *Id.* at 588 (emphasis added).

(1) NOPSI's oversight and review of its Grand Gulf obligation was uncritical and severely deficient. NOPSI's management remained ignorant of important information and significant events that affected NOPSI's Grand Gulf commitment at the same time that it was attempting to portray Grand Gulf as a great benefit to ratepayers.

(2) NOPSI made no effort to reduce its risk exposure in the wake of the Three Mile Island Nuclear incident in 1979–80, which demonstrated the risks of operating a nuclear reactor. Instead, it committed itself to take a share of the plant that FERC later found to be excessive.

(3) NOPSI imprudently failed to reduce the risk of its Grand Gulf commitment by selling a portion of its share of the power off-system, that is, to some other user. It made no attempt to ascertain whether off-system sales could be accomplished, despite its having made representations to the Council in 1980 that it would sell the power elsewhere if the Council desired.

The Council also determined that NOPSI's management was imprudent in committing NOPSI in 1974 to an indeterminate responsibility to pay for Grand Gulf, but it took no action based on this finding. Instead, it concentrated its inquiry and based the disallowance of the rate increase on actions NOPSI's management failed to take at the retail level to reduce the exposure of New Orleans ratepayers to the excessive risks and costs of the Grand Gulf project.

The Council also asserts that, in reaching its decision, it determined that disallowance of the full amount warranted by NOPSI's imprudence would cause NOPSI to become insolvent. It therefore disallowed only that portion of the excess costs—minus an additional ten percent "buffer"—attributable to imprudent management that the Council determined the utility could stand financially.

NOPSI therefore resorted once again to federal court, seeking injunctive and declaratory relief from the Rate Order. It contends that the Order is inconsistent with and preempted by federal law, that the federal courts are vested with exclusive jurisdiction by the Federal Power Act, 16 U.S.C. § 825p, and that, if the Rate Order is allowed to stand, it will suffer irreparable harm. It contends that the Council had assured it in the settlement agreement that it would be allowed to recover the $135 million in deferred costs through future rate increases. The elimination of this asset has drastically reduced its common equity and eliminated its retained earnings. It has been unable to sell rate recovery bonds as it had planned to do in March, 1988, will be unable to sell additional rate recovery bonds for several years, and is threatened with possible calls for redemption of $115 million in outstanding rate recovery bonds. NOPSI states that it also needs funds to continue to pay its FERC-mandated bill for Grand Gulf and other operating expenses. It will be unable to pay dividends on either preferred or common stock for at least several years, and its ability to continue as a viable entity is drastically impaired.

The district court, following this court's decision in *NOPSI I*, found that the Johnson Act[14] did not deprive it of jurisdiction over the suit; it did not have exclusive jurisdiction of the suit under the Federal Power Act; and it should abstain from exercising its jurisdiction, deferring to the state proceedings. Relying on the Supreme Court decision in *Burford v. Sun Oil Co.*,[15] the court distinguished *Nantahala*, stating that *Nantahala* did not involve a prudence issue. The utility regulatory body in *Nantahala* had simply refused to recognize the FERC allocation without any consideration of managerial prudence or other cost savings available. In this case, on the other hand, the Council had explicitly recognized the FERC-allocated costs, but had determined that, given those costs, NOPSI's management should have reduced their impact by selling some

---

**14.** 28 U.S.C. § 1342 (1982).

**15.** 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).

of its Grand Gulf power "off system," as its President had earlier said it could do.

The district court based its decision to abstain on the concept stated in *NOPSI I,* that "the regulation and adjustment of local utility rates is of paramount local concern and a matter which demands local administrative expertise."[16] The fact that the Council had completed its prudence inquiry did not end the need for state administrative involvement. The Council's Rate Order is subject to review in Louisiana state court. (In fact, NOPSI has sought an injunction in state court; it understandably could not forego that avenue for relief if this suit failed. The state trial court has denied the injunction and NOPSI has appealed to the state intermediate appellate court, seeking expedited consideration. The state trial court record was not scheduled to be filed with the state appellate court until July 15, 1988, however, and that appellate court has therefore deemed the motion for expedited appeal premature.)

The federal district court also observed, however, that it was not ready to assume that many, if any, purchasers could be found today to buy the power allocated to NOPSI. It continued:

> Indeed, this court is somewhat mystified by the Council's logic in arriving at the $135 million disallowance in the Rate Order. In the Rate Order, the Council simply concluded that since [NOPSI's President] said so, savings were actually possible. Then, the Council seemingly pulled from thin air a figure of 8% for the prudence disallowance. However, the Council, and in this case, everyone else knows that the 8% figure was not pulled from thin air but represents the difference between FERC's 17% allocation and what NOPSI consistently claims as its relative share in the MSU system, i.e. 9%. Thus, the disallowed costs bear no apparent relationship to the savings NOPSI is said to have foregone. Must

not the savings posited as the reason for the disallowance be at least possible in an actual economic market? Furthermore, must not the ultimate disallowance bear some rational relationship to the possible savings which support that disallowance? These questions must be resolved on another day in another court.

The district court did not reach the other factual issues. We must assume that the court thought it should abstain even if NOPSI were able to prove, as it alleges, with some apparent evidentiary support, that what was not clear when *NOPSI I* was decided is now clear: the Rate Order results in "trapping" FERC allocated costs in violation of federal law; important facts have therefore changed since the decision in *NOPSI I;* the Rate Order itself demonstrates that the disallowance of rate increases was based on factors that the state could not legally consider; and consequently the Order "is beyond the Council's retail ratemaking authority and violates federal law."

## II.

■ If the jurisdiction of federal courts over this dispute is made exclusive by the Federal Power Act, the district court should not have abstained. The Act grants federal courts exclusive jurisdiction over all suits brought to enforce any "duty created by ... any rule, regulation, or order" promulgated under the Act.[17] NOPSI's thesis is that the Act creates a duty on the part of the Council to recognize for retail ratemaking purposes NOPSI's FERC allocation, net of cost savings in other areas, and that the duty must be enforced by and can be enforced only in federal court.

In *Nantahala,* the Supreme Court expressly held that the filed rate doctrine requires local utility regulators to "allow, as reasonable operating expenses, costs in-

---

16. 798 F.2d at 862.

17. 16 U.S.C. § 825p (1982) provides in pertinent part:

> The District Courts of the United States ... shall have exclusive jurisdiction of violations of this chapter or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of this chapter or any rule, regulation, or order thereunder.

curred as a result of paying a FERC-determined wholesale price." [18] The Court further stated, "[o]nce FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable." [19] Correspondingly, in *NOPSI II* this court stated:

[O]nce the FERC has allocated wholesale power, a state regulatory body may not refuse to recognize that allocation. The state may not, for example, find the allocation unreasonable and "trap" any extra costs by refusing to allow the utility to pass those costs on to consumers.[20]

After oral argument had been heard in this case, the Supreme Court rendered its opinion in *Mississippi Power & Light Company v. Mississippi ex rel. Moore*, a case which, like *Nantahala*, came to the Court by direct appeal.[21] In *Mississippi Power*, the Court held that the FERC proceedings preempted a prudence inquiry by a state regulatory commission. The *Mississippi Power* prudence inquiry differed somewhat from the City Council's inquiry: it was directed to the prudence of entering into the Sales Agreement and the Grand Gulf project, while the Council's order is directed at NOPSI's asserted imprudence in failing to resell the power it had agreed and is now bound by the FERC order to buy. Nonetheless, the language of the opinion seems to foreclose the latter kind of prudence inquiry as well. Thus, for example, the Court stated:

States may not alter FERC-ordered allocations of power by substituting their own determinations of what would be just and fair. FERC-mandated allocations of power are binding on the States, and States must treat those allocations as fair and reasonable when determining retail rates....

States may not bar regulated utilities from passing through to retail consumers FERC-mandated wholesale rates.

"The filed rate doctrine ensures that sellers of wholesale power governed by FERC can recover the costs incurred by their payment of just and reasonable FERC-set rates. When FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate.... Such a 'trapping' of costs is prohibited." [22]

... Thus we conclude that the Supremacy Clause compels the [state regulatory commission] to permit MP & L to recover as a reasonable operating expense costs incurred as the result of paying a FERC-determined wholesale rate for a FERC-mandated allocation of power.

... [I]t might well be unreasonable for a utility to purchase unnecessary quantities of high cost power, even at FERC-approved rates, if it had the legal right to refuse to buy that power. But if the integrity of FERC regulation is to be preserved, it obviously cannot be unreasonable for MP & L to procure the particular quantity of high-priced Grand Gulf power that FERC has ordered it to pay for. Just as Nantahala had no legal right to obtain any more low cost TVA power than the amount allocated by FERC, it is equally clear that MP & L may not pay for less Grand Gulf power than the amount allocated by FERC.

....

... Thus FERC's order specifically bars a state regulatory agency from evaluating the prudence of Grand Gulf "in light of local conditions." [23]

In *NOPSI I*, this court held that it does not follow from *Nantahala* that the duty imposed on a state regulatory body to recognize FERC allocations and rates must

---

**18.** 476 U.S. at 966, 106 S.Ct. at 2356.

**19.** *Id.* at 967, 106 S.Ct. at 2357.

**20.** 833 F.2d at 586 (citations omitted).

**21.** ___ U.S. ___, 108 S.Ct. 2428, 101 L.Ed.2d 322 (1988).

**22.** *Id.* at ___, 108 S.Ct. 2428 at 2439 (quoting *Nantahala Power & Light Co. v. Thornburg*, 476 U.S. at 970, 106 S.Ct. at 2359).

**23.** *Id.* at ___, 108 S.Ct. at 2438–41.

be enforced by a federal court. While the Federal Power Act did grant FERC exclusive authority to regulate interstate transmission and sale at wholesale of electric energy, it reserved to the states regulatory jurisdiction over generation facilities and the intrastate transmission of electric energy.[24] This dichotomy of supervision made it foreseeable to Congress that what has happened in Louisiana might indeed come to pass: conflicts might arise over a state's attempt to regulate matters reserved to the FERC. The filed rate doctrine was developed to ensure the supremacy of FERC's orders in state as well as federal proceedings.[25] It does not establish federal exclusivity.

*NOPSI I* therefore rejected the claim that federal jurisdiction is exclusive:

> The existence of [a] "bright line" [between federal and state jurisdiction] colors the way we view a preemption claim involving the Federal Power Act. NOPSI has attempted to depict the situation before us as one in which the Council is stepping into the realm of *wholesale* rate making, a field under the exclusive jurisdiction of FERC. NOPSI focuses on the disruption of a *federal* scheme. Yet federal court intervention here may constitute a disruption of a *state* regulatory scheme, for *retail* rate making is clearly a field left to the jurisdiction of the states.... *Nantahala* recognizes that retail rates need not necessarily be increased to reflect the corresponding increase in wholesale rates set by FERC. Instead, local councils are permitted the autonomy preserved to them by the Federal Power Act and can consider cost savings in other areas relevant to the setting of retail rates.[26]

Thus *NOPSI I* holds that while state regulators are bound by FERC decisions and the filed rate doctrine, the doctrine may be invoked in state proceedings and the existence of a filed rate issue does not dictate federal court jurisdiction. As the opinion in *NOPSI I* acknowledges,[27] two other circuits have reached the same conclusion, deciding to abstain,[28] while three other courts have refused to do so.[29]

### III.

■ The Supreme Court has held that, in three different situations, a federal court with jurisdiction over a matter that also lies within the jurisdiction of a state court or agency should abstain from exercising its jurisdiction.[30] When a case involves unsettled questions of state law, the resolution of which may make it unnecessary to decide a federal constitutional question, the federal court should abstain pending resolution of the state-law questions by a state court,[31] a doctrine known as *Pullman* abstention after the Supreme Court case that first invoked it. A federal court should also abstain from deciding a case to avoid needless conflict with a state's administration of its own affairs, a rule applied in

**24.** 16 U.S.C. § 824(b) (1982); *see also NOPSI I,* 798 F.2d at 860.

**25.** *See Nantahala,* 476 U.S. at 962, 106 S.Ct. at 2355.

**26.** *NOPSI I,* 798 F.2d at 860–61 (emphasis in original).

**27.** *Id.* at 862 n. 1.

**28.** *See Aluminum Co. of America v. Utilities Comm'n,* 713 F.2d 1024 (4th Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *American Elec. Power Co. v. Kentucky Pub. Serv. Comm'n,* 787 F.2d 588 (6th Cir.1986); *but see Appalachian Power Co. v. Public Serv. Comm'n of West Virginia,* 770 F.2d 159 (4th Cir.1985), *aff'g without opinion* 614 F.Supp. 64 (S.D.W.Va.1985).

**29.** *See Kentucky West Virginia Gas Co. v. Pennsylvania Pub. Util. Comm'n,* 791 F.2d 1111 (3d Cir.1986); *Middle South Energy, Inc. v. Arkansas Pub. Serv. Comm'n,* 772 F.2d 404 (8th Cir.1985), *cert. denied,* 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986); *International Bhd. of Elec. Workers, Local Union No. 1245 v. Pub. Serv. Comm'n,* 614 F.2d 206, 212 n. 1 (9th Cir.1980).

**30.** *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813–17, 96 S.Ct. 1236, 1244–46, 47 L.Ed.2d 483 (1976).

**31.** *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *see also Colorado River,* 424 U.S. at 814, 96 S.Ct. at 1244; *see generally* 17 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure §§ 4241–42 (1978 & Supp.1987).

**1078**

*Burford v. Sun Oil Co.* [32] In *Younger v. Harris,* [33] the Supreme Court ruled that a federal court should abstain from deciding actions brought in an equitable setting when considerations of comity and federalism, relating both to a state's interest in conducting a pending state court proceeding and to the state's ability to consider federal constitutional claims in that setting, so dictate.

In *Colorado River Water Conservation District v. United States,* [34] the Supreme Court approved dismissal of a federal court suit on the basis of "considerations of '[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation,'" [35] although abstention would not have been appropriate under previously recognized abstention doctrines. In *Colorado River,* the Court observed that "the circumstances permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding for reasons of wise judicial administration are considerably more limited than the circumstances appropriate for abstention." [36]

In *Evanston Insurance Co. v. Jimco, Inc.,* [37] on which NOPSI relies, we considered the application of the *Colorado River* rule because judicial proceedings were pending in both state and federal court and only considerations of judicial administration were involved. In *NOPSI I,* however, the district court based its decision to abstain primarily on the *Burford* rule, seeking to avoid intrusion into the state administration of a complex state regulatory system. The *Evanston Insurance* decision is therefore not applicable here.

Turning to the appropriateness of *Burford* abstention in this case, we do not write on a clean slate. While the district court's decision to abstain is reviewable, we are not to decide whether we would write the same opinion if we were sitting as a trial court, but whether the district court abused its discretion in reaching its decision, a question whose answer requires at least some deference to the district court's views. In addition, we are bound by the text and the implicit philosophy of *NOPSI I.* In *NOPSI I* this court affirmed the district court's decision to abstain because exercising federal jurisdiction would interfere with the state regulatory system:

[T]he regulation and adjustment of local utility rates is of paramount local concern and a matter which demands local administrative expertise. The regulatory system is complex. In addition, the Louisiana state courts are fully able to address NOPSI's complaints about Council actions: appeals from Council orders are to be filed with the Civil District Court for the Parish of Orleans.... Nor would federal abstention foreclose the United States Supreme Court from entertaining NOPSI's preemption claim should it wind its way up through the state courts, as is demonstrated by the path of the recent *Nantahala* case.[38]

The opinion continued, "Although we do not intimate that abstention in the face of a preemption claim under the Federal Power Act may never constitute an abuse of discretion, abstention should perhaps more often obtain in cases presenting a question of preemption under the Federal Power Act

**32.** *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *see also Colorado River,* 424 U.S. at 814–15, 96 S.Ct. at 1244–45; *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959); *see generally* Wright, Miller & Cooper, *supra* note 31, at §§ 4241, 4244.

**33.** *See Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *see also Ohio Bureau of Employment Servs. v. Hodory,* 431 U.S. 471, 477, 97 S.Ct. 1898, 1902–03, 52 L.Ed.2d 513 (1977); *Colorado River,* 424 U.S. at 816, 96 S.Ct. at 1245–46; *see generally* Wright, Miller & Cooper, *supra* note 31, at §§ 4241, 4251–55.

**34.** 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).

**35.** *Id.* at 817, 96 S.Ct. at 1246 (quoting *Kerotest Mfg. Co. v. C–O–Two Fire Equip. Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200, 203 (1952)).

**36.** *Id.* at 818, 96 S.Ct. at 1246.

**37.** 844 F.2d 1185 (5th Cir.1988).

**38.** 798 F.2d at 862.

than would be so in cases presenting other types of federal preemption claims." [39]

The *NOPSI I* opinion also stated, "[M]oreover, on these facts, abstention seems appropriate under the doctrine of *Younger v. Harris.*" [40] *Younger* would justify abstention because the Council proceedings constituted an ongoing state judicial proceeding, involving important state interests, and in that proceeding NOPSI had an adequate opportunity to litigate its federal claims. The opinion noted, in connection with the appropriateness of *Younger* abstention, the absence of "bad faith, harrassment, or other exceptional circumstances." [41] *NOPSI I* thus recognized a second basis for its affirmance of the district court's decision to abstain.

■ The court in *NOPSI I* did not partially reverse the district court's decision to abstain by requiring it to decide whether the Council should be enjoined to allow NOPSI to pass on all of the costs allocated by FERC while affirming that decision only insofar as it abstained from interfering with the City Council's retail ratemaking functions. It decided instead to abstain totally. When a federal court decides to abstain, it does not decide to keep federal hands off only so long as the state agency behaves as the court thinks proper. Instead, it decides not to interfere at all, leaving to the state agency, the state courts, and, ultimately, the United States Supreme Court, the interpretation of both state and federal law and the ultimate protection of the federal constitution.

Although more facts are now known, NOPSI foresaw the issues these facts have raised. The first *NOPSI I* opinion outlined the issues NOPSI raised at that time:[42]

NOPSI first raised a statutorily-based preemption claim. NOPSI alleged that the Council, in setting NOPSI's retail rates, had refused to recognize the expenses NOPSI was required to pay by FERC order: the Council's rate freeze assumed in essence that the FERC opinion had never been issued, and that NOPSI was obtaining no Grand Gulf Unit I power. The refusal to recognize FERC-determined wholesale costs for retail rate-making purposes frustrated the FERC order allocating costs, thereby violating FERC's exclusive authority to regulate wholesale energy under the Federal Power Act, 16 U.S.C. §§ 824–824k. NOPSI also claimed that the Council's refusal to honor the FERC order constituted an impermissible burden on interstate commerce, as NOPSI would be rendered insolvent; the FERC order allocating costs among companies in several states would be frustrated; financial agreements among the MSU companies would be harmed; the operation of Grand Gulf Unit One would be threatened; and the viability of the interstate integrated electric system would be seriously undermined.

The opinion in *NOPSI I* noted that the challenge was only to "anticipated state agency action," [43] but the issues before the court now are the same as those presented in that case. The only differences are that the administrative proceeding before the City Council has been completed and the Supreme Court has decided *Mississippi Power & Light*, a case in which abstention was not an issue. The Council proceeding, followed by the opportunity for state review, thus constitutes an ongoing judicial proceeding.[44]

In *NOPSI II*, NOPSI sought an injunction to prevent the Council from trapping the FERC-allocated Grand Gulf costs. Addressing the question whether the issue was ripe, the Council argued that the court should wait to see what action the Council

**39.** *Id.* at 861.

**40.** *Id.* at 863.

**41.** *Id.* at 864; *see Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 435, 102 S.Ct. 2515, 2523 (1982).

**42.** 782 F.2d at 1238.

**43.** 798 F.2d at 864 n. 3.

**44.** *See Ohio Civil Rights Comm'n v. Dayton Christian Schools, Inc.,* 477 U.S. 619, 626, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986); *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. at 432–34, 102 S.Ct. at 2521–22.

took. Until then, the issue was not ready for court action. Now the Council has acted. Accordingly, it retreats to a second line of defense: the issue is ripe but the court should abstain. The Council's arguments in the successive cases appear to involve a certain amount of adroitness, but the opinion in *NOPSI I* nonetheless requires us to uphold the district court's decision to abstain.

### IV.

The decision to abstain from intervening at an earlier stage and not to restrict the Council's action to purely retail ratemaking concerns, as may have been permitted by *Nantahala,* allowed the Council to proceed with a hearing at least ostensibly addressed to retail ratemaking. Abstention necessarily forces the state courts to consider the application of the Supreme Court decisions and will eventually present the Supreme Court itself, already burdened by a massive docket, with a case that may involve only the application of principles it has now clearly articulated. Only that Court can resolve the conflict among the federal courts about the appropriateness of abstention in this situation, and it has not yet spoken. This court has. In so doing, this circuit has made a rule for this case. NOPSI must seek relief elsewhere.

For these reasons, the judgment is affirmed.