TEXACO, INC.

v.

Harry R. HUGHES, Governor of the State of Maryland and Stephen H. Sachs, Attorney General of Maryland and Alan Thomas Bell, Commissioner of Consumer Credit of Maryland.

AMOCO OIL COMPANY

v.

Harry R. HUGHES, Governor of the State of Maryland and Stephen H. Sachs, Attorney General of Maryland and Alan Thomas Bell, Commissioner of Consumer Credit of Maryland.

Civ. Nos. HM82–1814, HM82–1870.

United States District Court,
D. Maryland.

July 30, 1982.

Wilbur D. Preston, Ward B. Coe, III, Gerard J. Carpency, Baltimore, Md., for Amoco, Inc.

Randall B. Robinson, White Plains, N.Y., James R. Eyler and Thomas E. Lynch, III, Baltimore, Md., for Texaco, Inc.

Dorothy A. Beatty and Diana Motz, Asst. Attys. Gen. for Maryland, Baltimore, Md., for defendants.

HERBERT F. MURRAY, District Judge.

The plaintiffs in these two related actions, Texaco, Inc. in Civil No. HM82–1814 and Amoco Oil Company in Civil No. HM82–1870, have both brought suit against the Governor of the State of Maryland and the Attorney General of the State, and the Commissioner of Consumer Credit for Maryland seeking declaratory and injunctive relief to restrain enforcement of section 12–506(h) of the Commercial Law Article, Maryland Annotated Code, which as amended most recently by Senate Bill 332 and House Bill 597, added three new subsections to section 12–506(h), as follows: (3)(i) The charges prohibited by this section include, but are not limited to, charges indirectly imposed on the buyer when the seller or financial institution imposes such charges on a wholesaler or retailer while the seller or financial institution is also a producer, refiner, distributor, manufacturer, transporter or marketer of petroleum products sold on credit to the buyer, or when the seller or financial institution owns a fee simple or leasehold interest in the real property from which the petroleum products are sold on credit to the buyer.

(ii) The provisions of subparagraph (i) of this paragraph do not prohibit the seller or financial institution from imposing the charges described in subparagraph (i) of this paragraph for purchases of non-petroleum products.

(iii) For purposes of this paragraph, "petroleum product" has the same meaning as indicated in article 56, section 135(j) of the code.

Needless to say, both plaintiffs are national corporations and engage in interstate commerce in the business of refining, transporting and distributing petroleum products, including gasoline. Amoco has approximately 396 Amoco branded stations and jobbers in the State of Maryland, and Texaco has approximately 327 Texaco outlets in the State of Maryland. Both companies have for many years maintained credit card programs which permit credit card holders to purchase gasoline and other products on credit.

Because of rising interest rates and increased administrative costs in maintaining the credit card program, both Amoco and Texaco have developed revisions in their credit card system, the effect of which would cause wholesalers and retailers to bear part of the financial burden of expanded credit card services.

Amoco wishes to introduce in Maryland a "Discount for Cash" program. Under this program, Amoco would reduce the buying price of gasoline to the dealer by an amount reflecting the cost of credit in the particular geographic area. When credit slips are turned into Amoco by the dealer, Amoco charges a credit card processing fee for each actual credit card transaction. It encourages dealers to pass on the benefits of the decrease in wholesale price of gasoline to consumers by offering a cash discount to consumers who elect to pay cash for gasoline and other products. Where the program has been implemented, it has resulted in dealers offering gasoline at a regular credit price and a discount for cash price which is available to all consumers who elect to pay cash.

Amoco contends that the institution of this system in Maryland would be prohibited by the recent Commercial Code revisions because those revisions have as their purpose to prohibit the imposition of fees on dealers for credit card sales as Amoco would do in its discount for cash program, because the fee would be passed on to credit consumers as a prohibited indirect charge.

In the case of Texaco, prior to November 1, 1981, it charged its retailers and wholesalers an annual service fee not exceeding $36 per year for the right to participate in Texaco's credit card program. It processed credit card invoices by paying to its retailers and wholesalers 100 percent of the face value of credit invoices submitted.

On August 31, 1981, by written notice, Texaco advised all its dealers participating in the credit card program that the basic credit card agreement between the dealers and Texaco would be amended by eliminating the provision with regard to an annual fee and instituting a new 3 percent processing fee to be paid by each participating dealer, who would receive from Texaco 97 percent of the face value of credit card invoices under the new plan. The effect of the revisions to the Commercial Code recently enacted by the Maryland Legislature would be to prohibit the 3 percent processing fee being imposed on any wholesaler or retailer.

The standards to be applied in ruling on a motion for injunctive relief are well established. In this circuit in *Blackwelder Furniture Company of Statesville v. Seilig Manufacturing Company,* 550 F.2d 189 (4th Cir.1977), the Court of Appeals applied the balance of hardship test which requires the trial court to consider the flexible interplay among four factors: One, the likelihood of irreparable harm to the plaintiff if the injunction is denied; Two, the likelihood of harm to the defendant if the requested relief is granted; Three, the likelihood that plaintiff will succeed on the merits; and Four, the public interest.

It is also to be noted that where the preliminary injunction seeks to enjoin enforcement of a state statute, other rulings of the Supreme Court must be considered in applying the *Blackwelder* standards. In *Virginia Surface Mining and Reclamation Association, Inc. v. Andrus,* 604 F.2d 312, 315 (4th Cir.1979), the Fourth Circuit criticized the use of *Blackwelder* in a case not involving private litigation, stating that the principles of *Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) were applicable. In *Yakus,* in distinguishing suits involving only private interests from those involving the public interest, the Supreme Court commented: "But where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff. . . . This is but another application of the principle, declared in *Virginia R. Company v. System Federation,* 300 U.S. 515, 522, 57 S.Ct. 592, 601, 81 L.Ed. 789, that 'Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved.'" 321 U.S. at 440–42, 64 S.Ct. at 674–75.

So saying, the court upheld a denial of a preliminary injunction that had sought to enjoin enforcement of federal price control regulations during World War II under which the petitioners had been prosecuted criminally.

■ Two other related principles must also be considered where a suit involves a challenge to a state statute. First, a state statute must be presumed constitutional. Second, if a state statute can be construed in one way as constitutional and in another way as unconstitutional, it should be construed in a constitutional way. *Graham v. Richardson,* 403 U.S. 365, 382–83, 91 S.Ct. 1848, 1857, 29 L.Ed.2d 534 (1971); *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029 (4th Cir. 1980).

Amoco and Texaco both allege irreparable harm which would attend the failure to grant injunctive relief and the lack of any comparable harm to the defendants. It is claimed on behalf of the oil companies that their whole credit card operation will be endangered and they will be exposed to possible criminal sanctions because the processing fees or charges may be considered "indirect charges" proscribed by section 12–506(h)(3). It is claimed that the threat of criminal prosecution is real and immediate and cannot be avoided by any precautionary actions the oil companies might take. On the other hand, it is pointed out that if the court issues a preliminary injunction enjoining the enforcement of section 12–506(h), no direct harm to the defendants will accrue and no lost revenue to the state will result.

In weighing comparative hardships, the defendants point out that the economic effect of a finding that the statute is constitutional can be met by the oil companies by, among other things, adjusting the price of its products and adjusting financing charges on Maryland retail credit accounts. The defendants view Texaco's threat to suspend credit card operations entirely as not an action mandated by the statute, but rather a unilateral action which Texaco should not be permitted to proffer as evidence of its own harm. It likens Texaco's threat as in effect saying that it will shoot itself in the foot. It is said that Texaco then points to the gun with its own finger on the trigger and asks the court to consider the hole that the bullet would make to be irreparable harm. Defendants further urge that there is a paramount public interest in giving effect to legislation passed by the public's elected representatives and signed by the Governor. It is suggested that a federal court should exercise great restraint in invalidating legislative acts which are designed to meet what the public representatives construe to be a need of a substantial segment of commercial interests.

It appears to the court after considering the respective contentions of both sides that the balance of hardships weighs in favor of the defendants.

■ With regard to the issue of whether the plaintiffs can show a likelihood of success on the merits, the court feels that this is open to considerable doubt. The plaintiffs mount a variety of attacks on the validity of the statute. First, it is said that the statute violates the due process clause of the Fourteenth Amendment to the Constitution because it is unconstitutionally vague and subjects the oil companies to criminal sanctions without giving adequate notice of what is proscribed. In this connection, it is true, of course, that a statute must afford an ordinary person fair notice that his contemplated conduct is forbidden. It is also true, however, that a reviewing court must look at a statute and give its words their fair meaning in accordance with the intent of the legislation. Statutes alleged to be void for vagueness which do not raise First Amendment issues must be examined as applied, rather than merely construed, to save them from being declared unconstitutional or void for indefiniteness. It appears to the court to be plain that the wording of the statute proscribes the contemplated charge to be imposed on wholesalers and retailers of petroleum products. The 3 percent processing fee to be imposed by Texaco is clearly a "discount fine, commission, charge, brokerage or oth-

er consideration" within the meaning of the statute and Texaco is by definition a financial institution that is "also a producer, refiner, distributor, manufacturer or marketer of petroleum." The plain language of the sections of the statute just quoted when applied to the facts of this case would provide fair notice to a person that his contemplated conduct is forbidden. Further, it is clear that contrary to the argument advanced by the oil companies, such overhead expenses as wages and rent, when included within the final price of the petroleum product, would not come within the purview of the statute which does not regulate any charges that are not "in connection with an open-end account."

The second ground of attack is that the statute violates the due process and equal protection clauses of the Constitution in that it arbitrarily and capriciously distinguishes between indirect charges for credit assessed by petroleum producers and indirect charges imposed by other financial institutions.

After noting that the Equal Protection Clause is designed to assure that similarly situated people receive similar treatment under the law, Texaco in its brief admits that the constitutional command of impartiality does not prevent a state from enacting legislation which treats different classifications of people in different ways. In order to determine whether the classification created by the legislature bears a rational relationship to a legitimate governmental interest, Texaco poses the questions (1) Do Senate Bill 332 and House Bill 597 have a legitimate purpose? and (2) Was it reasonable to believe that the use of the classification created would promote that purpose?

In answering the first question, Texaco admits a legitimate purpose to the legislation, namely, protecting credit card customers from hidden finance charges. Rather, it is the means of achieving that purpose which Texaco questions. It concludes that the only thing achieved by the legislation is to discriminate against and to require the discontinuance of the credit operations of Texaco and other petroleum producers in favor of the credit operations of other financial institutions. Texaco finds an arbitrary and capricious classification from the fact that the statute permits financial institutions other than petroleum producers to charge a fee (a merchant's discount fee, which actually may exceed the oil companies' processing fee) to Texaco retailers for processing credit with respect to purchases of petroleum products while at the same time prohibiting the oil companies from assessing precisely the same type of fee. This may wind up in the credit card customer, whom the legislation intended to benefit, being faced with a higher cost for petroleum products if the fee dealers have to pay on Visa and Mastercard and similar credit cards exceeds the oil companies' processing fee.

Defendants on the other hand point to the fact that the applicable standard to be applied in cases involving discrimination in economic regulation is the "rational basis" standard laid down in *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976), where the court said, "Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions, such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discrimination and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under the police powers, and rational distinctions may be made with substantially less than mathematical exactitude."

Under this standard, the legislative determinations are accorded great deference: "In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...." As the Supreme Court further noted, "When local economy regulation is challenged solely as violating the Equal Protection Clause, this court consistently

defers to the legislative determinations as to desirability of particular statutory discriminations. *See, e.g., Lehnhausen v. Lake Shore Auto Parts,* 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)." *New Orleans v. Dukes,* 427 U.S. at 303, 96 S.Ct. at 2516.

■ It should be borne in mind that in considering the legislative purpose, the General Assembly increased the rate of financial charges for all finance institutions from 18 percent to 24 percent per annum on all open-end credit accounts. This means that the oil companies are allowed to charge 6 percent more in finance charges on open-end accounts regardless of whether the buyer purchases petroleum or non-petroleum products. The legislature by enacting this statute obviously had the intent that in the purchase of petroleum products on an open-end credit account, the cost of the credit program should be recovered from only two sources: One, increased cost of its product to the retailer and two, increased amount of the finance charge paid by the buyer. The cost of credit card systems in this instance will not be subsidized by the dealer. This ability to recoup excess credit costs in the pricing of goods provides the rational basis for distinguishing between the oil companies and other financial institutions. Unlike Texaco or Amoco, the other financial institutions have no product to sell and therefore cannot adjust their prices. In the case of petroleum products, there is a difference between the institutions and the legislature has chosen to treat them differently. It is not for this court to set aside this legislative determination.

Finally, plaintiffs argue that section 12–506(h)(3) is pre-empted by the Cash Discount Act of 1981, which amended the Truth in Lending Act.

The stated purpose of the amendment was to "encourage" discounts for cash purchases. Accordingly, it removes the previous five percent limit on cash discounts. It further contains a definition of "regular price" which distinguishes permissible cash discounts and unlawful surcharges. 97 U.S. Code Congressional and Administrative News, 1981, 74, 76.

The Cash Discount Act, codified as 15 U.S.C. 1666f, states in its entirety: (a)(1) With respect to credit cards which may be used for extensions of credit in sales transactions in which the seller is a person other than the card issuer, the card issuer may not, by contract or otherwise, prohibit any such seller from offering a discount to a card holder to induce the card holder to pay by cash, check or similar means rather than use a credit card. (2) No seller in any sales transaction may impose a surcharge on a card holder who elects to use a credit card in lieu of payment by cash, check or similar means. (b) With respect to any sales transaction, any discount from the regular price offered by the seller for the purpose of inducing payment by cash, checks or other means not involving the use of an open-end credit plan or a credit card shall not constitute a finance charge as determined under section 1605 of this title if such discount is offered to all prospective buyers and its availability is disclosed clearly and conspicuously.

■ In analyzing the issue of federal preemption under the Supremacy Clause, several principles enunciated by the Supreme Court offer guidance. "Preemption of state law by federal statute or regulations is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained.' " *Chicago and Northwest Trust Company v. Kalo Brick and Tile Company,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981), citing with approval *Florida Lime and Avocado Growers v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). In addition, the preemption doctrine does not prohibit states from regulating activities which are "a merely peripheral concern of federal law." *Chicago and Northwest Trust, supra* at 317, 101 S.Ct. at 1129.

The stated intent of Congress in enacting TILA, later amended by the Cash Discount Act, was as follows: this subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability

of the laws of any state, including but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply. 15 U.S.C. 1610(b).

Thus, "[t]he Congress clearly did not preempt the field" in enacting the TILA, as "the substantive law of the state is preserved intact." *Mason v. General Finance of Virginia,* 542 F.2d 1226 (4th Cir.1976).

However, "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Fidelity Federal Savings and Loan Association v. De La Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

In addition to those sections specified above, 15 U.S.C. 1666j(c) states: "(c) Notwithstanding any other provisions of this subchapter, any discount offered under section 1666f(b) of this title shall not be considered a finance charge or other charge for credit under the usury laws of any state or under the laws of any state relating to disclosure of information in connection with credit transactions, or relating to the types, amounts or rates of charges, or to any element or elements of charges permissible under such laws in connection with the extension or use of credit."

An examination of the Cash Discount Act and the Maryland statute reveals that the Maryland law does not conflict with or impede compliance with the federal act. Retailers of petroleum products may offer their customers discounts for cash purchases as they could pursuant to section 12–509 before the passage of section 12–506(h)(3).

Upon a reading of the Cash Discount Act and its legislative history, it is obvious that the provisions of section 1666f were implemented by Congress to prevent credit card issuers from prohibiting retailers from offering discounts to consumers who elect to pay for goods or services with cash. Neither the Cash Discount Act nor any other provision of TILA prohibits states from preventing credit card issuers from imposing processing charges on retailers.

In addition, the provisions of section 1666j are similarly inapplicable. The General Assembly has banned the imposition of charges imposed by oil companies on their wholesalers and retailers. These prohibited charges are not cash discounts offered by retailers, but rather an "extra" charge imposed upon them. These charges may not be imposed by oil companies with regard to retail credit accounts regardless of the amount of finance charge, if any, they impose on credit card customers. Therefore, any difference between the credit and cash price offered at the pump by Texaco dealers is not a finance charge, under either the Cash Discount Act or section 12–509. Texaco's challenge to the definition of "finance charge" in section 12–501(f), moreover, is irrelevant to a review of the statute challenged.

Finally, plaintiffs' argument that the Cash Discount Act was intended in some manner to preempt a state's power to regulate the levying of a credit card processing fee at the card issuer's level ignores the Act's legislative history. Indeed, the entire issue of indirect charges generated by a processing fee being applied to a seller was consciously avoided by the Congress. This issue arose within the context of the ban on surcharges in credit transactions. Opponents of the ban argued strenuously that the ban unfairly allowed credit card issuers to pass on processing fees ultimately to the buyer in the form of higher prices. However, Congress chose to defer confronting the problem of indirect fees passed on to the buyer in the form of higher prices: "The Committee recognizes that one of the basic issues in the surcharge debate is

whether or not credit card operations result in higher overall prices and therefore whether cash customers subsidize credit card customers. Very little concrete information has been presented during the hearings over the years to either refute or substantiate the 'subsidization' theory. Therefore, the Committee is requesting the Federal Reserve Board to study this issue and present its findings to both the House and the Senate Banking Committees no later than two years after the date of enactment." 1981 U.S.Code Congressional and Administrative News, Volume 2 at 77.

Therefore, the court rejects the argument that the statute is preempted by the TILA or the amendments thereto. The court notes that this view coincides with that of Judge Levin of the Circuit Court of Calvert County, who stated when he declined to grant a preliminary injunction against the operation of the statute that "There is no conflict between this law and any federal law."

Texaco also suggests that the statute violates the Commerce Clause of the United States Constitution because it discriminates against and unduly burdens interstate commerce.

Several Texaco witnesses, including Mr. Michael M. Zvonkovic, the Manager of Credit Card Marketing for Texaco, stated that if a preliminary injunction does not issue, Texaco will instruct its dealers not to accept out-of-state credit cards as well as those held by Maryland residents. Of course, under Maryland law, a Texaco retailer would not be prohibited from accepting either an in-state or out-of-state credit card so long as Texaco did not impose a processing fee on the retailer. Mr. Zvonkovic stated that Texaco would necessarily have to reject out-of-state cards as well as in-state cards because the Texaco credit card does not bear an address and Texaco dealers therefore would find it virtually impossible to distinguish between Maryland resident holders of the Texaco credit card and out-of-state holders. Assuming, therefore, that Texaco refuses to allow its dealers in Maryland to accept out-of-state credit cards, the issue is whether the inability of a Texaco credit card holder to use his card in Maryland imposes an impermissible burden on interstate commerce. Before proceeding to analyze this issue, the court again notes that the Maryland law does not compel Texaco to refuse to accept either in-state or out-of-state credit cards. Texaco could accept credit cards held by both in-state and out-of-state holders as long as it did not impose a processing fee on the retailer.

The analytic framework for considering Commerce Clause challenges was set forth in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), recently reaffirmed in *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36–37, 100 S.Ct. 2009, 2015–2016, 64 L.Ed.2d 702 (1980) as follows: "Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the virtue of the local interest involved, and on whether it would be promoted as well with a lesser impact on interstate activities." (citation omitted)

The court finds that the General Assembly, in enacting the statute, has approached the problem in an evenhanded fashion. The law applies equally to both in-state and out-of-state institutions. As discussed earlier, the legislation does not unfairly discriminate against financial institutions dealing in petroleum products. The General Assembly, in regulating the cost of credit in Maryland, has apparently determined that a legitimate local public interest will be promoted when wholesalers or retailers are not forced to bear the cost of a credit card system in the sale of petroleum products on an open-end retail credit account. The court cannot say that the legislature's apparent determination that credit card cost must be extracted from the

buyer in the form of higher finance charges or from all wholesalers or retailers in the form of increased product cost is not a legitimate public interest. Nor can the court find that any lesser restrictions than those contained in the legislation could accomplish this purpose.

The burden on interstate commerce is not "clearly excessive." Out-of-state motorists who hold a Texaco credit card will be free to buy gasoline for cash or on credit if they hold a nationally-accepted bank credit card or hold the credit card of another oil company whose credit card operations remain in operation. That Texaco may lose some money to its competitors is also not a "clearly excessive" burden on interstate commerce. In *Exxon Corporation v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), the Supreme Court held that such a result did not visit an impermissible burden on interstate commerce: "... but interstate commerce is not subject to an impermissible burden simply because an otherwise valid regulation causes some businesses to shift from one interstate supplier to another."

For these reasons, the court rejects the argument that section 12–506(h)(3) violates the Commerce Clause of the United States Constitution.

The analysis just made leads the court to the conclusion that a preliminary injunction should not issue. The balance of hardships appears weighted in favor of the defendants. Plaintiffs' likelihood of success on the merits appears to this court to be remote. Finally, the public interest in enforcing statutes passed by its legislature must be taken into account. Accordingly, the motions for declaratory and injunctive relief filed by Texaco and Amoco will be denied.