Lalor v. Omtool, et al.                    CV-99-469-M    12/14/00
                    UNITED STATES DISTRICT COURT

                        DISTRICT OF NEW HAMPSHIRE


John Lalor and John Heck,
on Behalf of Themselves and All
Others Similarly Situated,
     Plaintiffs

     v.                                    Civil No. 99-469-M
                                           Opinion No. 2000 DNH 260
Omtool, Ltd, Robert L. Voelk,
Darioush Mardan, Martin A. Schultz,
and Bruce E. Evans,
     Defendants


                        **O R D E R**


     John Lalor and John Heck, on behalf of themselves and all

similarly situated individuals, bring this securities litigation

against Omtool, Ltd. and various officers and directors of the

company.  Pursuant to Rules 9(b) and 12(b)(6) of the Federal

Rules of Civil Procedure, defendants move to dismiss the amended

complaint.  Plaintiffs object.


                      **Standard of Review**

     A motion to dismiss under Fed. R. Civ. P. 12(b)(6) is one of

limited inquiry, focusing not on "whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). In considering a motion to dismiss, "the material facts alleged in the complaint are to be construed in the light most favorable to the plaintiff and taken as admitted." Chasan v. Village District of Eastman, 572 F.Supp. 578, 579 (D.N.H. 1983). See also The Dartmouth Review v. Dartmouth College, 889 F.2d 13, 15 (1st Cir. 1989). "[D]ismissal is appropriate only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Industries, Inc., 814 F.2d 22, 25 (1st Cir. 1987)(quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

## Background

Viewed in the light most favorable to plaintiffs, the material facts appear as follows. Omtool, Ltd. designs, develops, markets, and supports open client/server facsimile software, which automates and integrates fax communications. On August 8, 1997, Omtool became a publicly owned company by means

2

of an initial public offering ("IPO") of its stock.  Through the underwriters of the IPO, Omtool and defendants Voelk, Schultz, and Evans sold a total of approximately 4.6 million shares of Omtool common stock at $9 per share.

Eleven months later, after the market closed on July 8, 1998, Omtool warned that its revenues for the second quarter of 1998 would fall below analysts' projections.  The press release attributed the anticipated shortfalls "primarily . . . to several significant corporate contracts that were not completed on a timely basis."  Exhibit 4 to defendants' memorandum.  The following day, Omtool's stock fell over forty percent (40%).  Approximately two weeks later, Omtool announced its actual revenue for the second quarter and again pointed to its failure to complete several corporate contracts as one of the primary reasons for its disappointing earnings.  See Exhibit 5 to defendants' memorandum.  Again, the stock market reacted negatively, and Omtool's stock continued to decline.

On October 6, 1998, the end of the class period, the stock closed at $2.50 per share. After the close of the market, Omtool announced that it anticipated its third quarter results would fall below expectations. Although the company reported that it was "able to finalize several significant corporate contracts during the quarter," it attributed revenue shortfalls to "extended sales cycles and changes in the buying patterns of our customers." Exhibit 6 to defendants' memorandum. The following day, the stock again dropped substantially and closed at $1.6875. Thus, during the class period, the stock traded at a high of $14.75 per share and, at the end of the class period, fell to $2.50 per share - a decline of more than eighty percent (80%). In the ninety days following the close of the class period, however, the stock rebounded slightly and traded at an average price of approximately $2.85 per share.

The amended complaint appears to focus on two allegedly unlawful courses of conduct. First, plaintiffs claim that the Registration Statement and Prospectus prepared and distributed by defendants in connection with the IPO contained material

4

misstatements and omissions.  Specifically, plaintiffs challenge the accuracy of financial statements relating to the year ending December 31, 1996, and the six month period ending June 30, 1997, both of which were incorporated into the Prospectus.  See Amended complaint, counts 1 and 2.  Next, they say defendants engaged in fraud by knowingly recognizing improper revenue, "stuffing" distribution channels, making fictitious sales, and failing to maintain corporate accounting statements in accordance with generally accepted accounting principles.  See Amended complaint, counts 3 and 4.

Plaintiffs' complaint advances three basic claims.  Count 1 alleges violations of Section 11 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77k.  Count 2 alleges violations of Section 12 of the Securities Act, 15 U.S.C. § 77l.  Both counts relate to allegedly material false statements contained in the Prospectus.  Counts 3 and 4, on the other hand, relate to defendants' allegedly fraudulent conduct following the IPO.  Count 3 alleges violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and

5

Rule 10b-5 promulgated thereunder. And, although pled as a separate claim, Count 4 simply alleges that various individual defendants named in Count 3 are "controlling persons" of Omtool, within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, and are, therefore, individually liable to plaintiffs for alleged violations of Section 10(b) and Rule 10b-5. See, e.g., Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1216 n.29 (1st Cir. 1996) (noting that "Section 20(a) provides for derivative liability of persons who 'control' others found to be primarily liable under the Exchange Act.").

## Discussion

In support of their motion to dismiss, defendants advance four arguments. First, they say that the fraud in which they are alleged to have engaged did not cause the losses plaintiffs claim to have suffered. Second, they assert that plaintiffs' claims are barred by the statute of limitations. Next, defendants assert that plaintiffs' claims under section 12(a)(2) of the Securities Act must be dismissed for lack of privity. Finally,

defendants say the amended complaint fails to plead the alleged fraud with sufficient specificity.

I.    Loss Causation.

Defendants say that "Plaintiffs' complaint was dead on arrival when filed because it does not allege that Defendants' supposed fraud scheme caused Plaintiffs any loss.  While investors who bought Omtool shares during the class period may have lost money, the Complaint confirms that it was not the allege fraud scheme that caused those losses."  Defendants' motion to dismiss at 1 (emphasis in original).

To state a prima facie claim under § 10(b) of the Exchange Act, a plaintiff "must allege two types of causation, both loss causation - that the misrepresentations or omission caused the economic harm - and transaction causation - that the violations in question caused the plaintiff to engage in the transaction in question."  Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992) (citation and internal quotation marks omitted).  See also 15 U.S.C. § 78u-4(b)(4) ("In any private action arising

7

under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."). To properly allege "loss causation," a plaintiff must allege that the defendant's misrepresentations were the reason the plaintiff's stock purchase turned out to be a losing one. In other words, "loss causation" is simply another name "for the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complaints." Bastian v. Petren Resources Corp., 892 F.2d 680, 685 (7th Cir. 1990). See also Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) ("To prove loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss. . . . In other words, loss causation describes the link between the defendant's misconduct and the plaintiff's economic loss.") (citations and internal quotation marks omitted). As to claims under § 11 and 12 of the Securities Act, "loss causation" is not an essential element of a viable cause of action. It is,

8

however, an affirmative defense that may be raised by a defendant.  See 15 U.S.C. § 77l(b).  See also 15 U.S.C. § 77k(e).

Here, plaintiffs have adequately alleged that, but for defendants' wrongful conduct, they would not have suffered the losses of which they complain.  Specifically, the amended complaint alleges that the market price of Omtool stock was artificially inflated due to defendants' material misrepresentations concerning various financial aspects of the company.  Had defendants accurately reported the company's financial status and had the company employed proper accounting principles in reporting income and losses, say plaintiffs, the price at which they purchased shares of the stock would have been substantially lower.  And, when the market finally saw an accurate picture of the company's financial health (following the press releases in July and, more specifically, in October of 1998), the value of the stock declined precipitously, causing the losses of which plaintiffs complain.  Assuming those allegations to be true - as the court must at this juncture - they are sufficient to plead "loss causation."  See, e.g., Semerenko v.

<u>Cendant Corp.</u>, 223 F.3d 165, 184 (3rd Cir. 2000) ("where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement."); <u>Miller v. New America High Income Fund</u>, 755 F. Supp. 1099, 1108 (D.Ma. 1991) (holding that to adequately plead loss causation, plaintiffs "must allege that they were injured because the risks that materialized were the risks of which they were unaware as a result of defendants' misleading statements, not the risks of which they were fully aware.").

Defendants suggest that because Omtool never admitted (or revealed to the public) any instances of fraudulent or improper accounting practices, such alleged fraud could not have caused the stock's precipitous decline. Consequently, say defendants, plaintiffs have failed to adequately plead a causal connection between the allegedly fraudulent accounting practices and the losses plaintiffs sustained. In short, defendants seem to be saying that if the public was never aware of the alleged fraud,

10

it could have had no impact on the value of Omtool stock.  While

that argument has some logical appeal, at least one circuit court

of appeals has rejected precisely such a claim.

> The district court concluded that Deloitte met this
> burden by showing that WOW never disclosed to the
> market the fact that the 1987 financial statements
> contained material errors.  This analysis was, quite
> simply, far too narrow.
>
> Loss causation exists where "the misrepresentation
> <u>touches upon</u> the <u>reasons</u> for the investment's decline
> in value."  The district court's application of section
> 11(e) ignores the broad nature of the "loss causation"
> determination.  Indeed, the plaintiffs rightly note
> that, if correct, "the district court's interpretation
> would eviscerate the statute.  Companies and their
> auditors could immunize themselves from § 11 liability
> for false and even fraudulent financial statements
> simply by refusing to admit their falsity (or refusing
> to include in the adverse public disclosures
> information that would 'clue in the market' to their
> falsity) prior to the time a § 11 suit is filed."

<u>In re Worlds of Wonder Securities Litigation</u>, 35 F.3d 1407, 1422-

23 (9th Cir. 1994) (citations omitted) (emphasis in original).

Finally, defendants say that since the price of Omtool's

stock increased in the 90 days following the October, 1998 press

release, plaintiffs cannot demonstrate that the fraud of which

11

they complain (which they also allege was revealed in that press release) actually caused the stock's price to decline. In fact, say defendants, the market responded to the October press release by assigning a higher value to Omtool's stock.

Notwithstanding defendants' claims to the contrary, however, that Omtool's stock rebounded slightly in the 90 days following the October, 1998, press release is of no substantial legal significance. One might reasonably posit that, after having artificially inflated the stock's value in the months following the IPO (as plaintiffs allege), defendants, mindful of their wrongdoing, eased the stock back down into a more accurate and realistic trading range by issuing a series of negative (but not entirely accurate) press releases designed to accomplish that goal, without risking the liability which would surely follow revelation of the true reason behind the stock's diminished value. In other words, if they unlawfully inflated the value of Omtool's stock, defendants knew that sooner or later the market would catch up with them. And, in such circumstances, one plausible option might be to slowly lower the stock's price by

12

issuing a series of negative but seemingly ordinary earnings reports and press releases – done in a manner gradual enough not to attract unwanted attention to the allegedly improper sales and bookkeeping practices, but deliberate enough to get the stock trading in an "appropriate" range given its true value.  Then, defendants could claim, as they do, that the market took the stock downward for reasons wholly unrelated to any allegedly unlawful sales or bookkeeping practices.

Plaintiffs do claim that the press releases issued following the IPO were consistent with such a scheme.  Plaintiffs say that defendants materially overstated Omtool's net income and earnings, at least arguably to avoid any precipitous decline in the value of Omtool's stock and, in so doing, disguised defendants' earlier unlawful conduct.  The fact that the stock price actually moved upward slightly in the 90 days following the October press release might mean little more than that defendants succeeded in guiding the stock's price down into a more reasonable trading range without ever having to acknowledge their alleged unlawful conduct and the stock's concomitant inflated

13

price.  And, according to plaintiffs, it was only in the wake of that October, 1998, press release that the public had sufficient information about Omtool's sales and accounting practices to be put on reasonable notice that the company might have engaged in unlawful conduct in the months leading up to and following the IPO.

The difference in the parties' positions is, not surprisingly, stark.  Plaintiffs claim that the decline in value of Omtool's stock was caused by, among other things, defendants' improper and, at times, fraudulent sales and bookkeeping practices.  Defendants, on the other hand, suggest that the stock's decline was caused by market factors wholly unrelated to any alleged wrongful conduct on their part.  At this stage of the litigation, however, the court must accept plaintiffs' factual allegations as true.  Doing so, it is apparent that plaintiffs have adequately alleged a causal connection between defendants' alleged wrongdoing and plaintiffs' claimed losses.

14

II.  Statute of Limitations.

Actions for violations of §§ 11 or 12 of the Securities Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  The same is true with regard to plaintiffs' claims under § 10(b) of the Exchange Act.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).

Plaintiffs filed their complaint on October 5, 1999, just less than one year after defendants' October 6, 1998 press release.  In support of their claim that plaintiffs' complaint is time barred, defendants say that nothing novel was disclosed in the October 6 press release.  Instead, they say, all pertinent information (including projections about future earnings shortfalls) was fully disclosed in the warning and subsequent earnings report, both of which were issued earlier, in July.  Thus, defendants argue, "if, as Plaintiffs claim, the October 6 press release 'announced the bad news' and revealed the fraud, then so too did the earlier combination of the July press

15

releases which disclosed the same information and the 42% stock drop that followed more than a year before filing suit." Defendants' memorandum, at 11. Consequently, defendants assert that plaintiffs were on notice of their potential claims in July of 1998, yet failed to file suit within one year of that date.

Plaintiffs disagree, noting first that any determination of when the statute of limitations began to run is most appropriately made in the context of summary judgment or, if there are disputed and material factual issues, following an evidentiary hearing. See, e.g., Olcott v. Delaware Flood Co., 76 F.3d 1538, 1549 (10th Cir. 1996). The court is inclined to agree, particularly since determining when the statute began to run first requires finding when plaintiffs learned or, in the exercise of reasonable diligence, should have learned of their potential cause(s) of action and because the press releases in question are not part of plaintiffs' complaint and, at least arguably, are not properly part of the record the court may consider in ruling on defendants' motion to dismiss. See generally Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)

16

("Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Rule 56. However, courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.").

Nevertheless, even if the court were to consider those press releases, resolution of defendants' motion to dismiss would be no different. Notwithstanding defendants' arguments to the contrary, the July press releases and the October press release do not appear to have disclosed identical information. As noted, the July press releases attributed Omtool's revenue shortfalls to its inability to complete corporate contracts on a timely basis. Three months later, however, the October press release represented that the company <u>had</u> been "able to finalize several significant corporate contracts." Having apparently addressed its inability to finalize customer contracts (the problem

identified in the July press releases), the company attributed revenue shortfalls in the most recent quarter to "further extended sales cycles and changes in the buying patterns of our customers."

At a minimum, whether the July press releases were sufficient to put plaintiffs on notice of defendants' allegedly wrongful conduct would seem to be a disputed, material fact. If, as plaintiffs allege, they did not have sufficient information to recognize their potential claims until after the October press release was issued, their suit was filed in a timely manner. This is particularly true since, as defendants point out, Omtool never revealed any fraud to the public. Thus, from plaintiffs' perspective, they were forced to piece together evidence of defendants' allegedly secret and unlawful practices and, only upon reviewing the October, 1998, press release, were they armed with sufficient information to realize that they had been had.

In light of the foregoing, the court is precluded from granting defendants' motion to dismiss on limitations grounds.

III. Privity and Who is a "Seller".

As to count 2 of the complaint, defendants say it fails to state a viable claim since none of the named defendants is a "seller" of securities for purposes of § 12(a)(2) of the Securities Act. Specifically, defendants point out that the Omtool IPO was made pursuant to a "firm commitment" underwriting and, therefore, all sales of Omtool shares were made by the underwriters (not named as defendants), rather than Omtool or its officers or directors. In response, plaintiffs say that they have adequately pled a viable claim, insofar as they have alleged that: (1) defendants "solicited" the sale of Omtool common stock in the August 1997 IPO and were motivated by financial gain to sell shares of Omtool in that offering; (2) defendants were involved in the preparation of the Prospectus; and (3) defendants were the primary beneficiaries of the stock offering. See Amended complaint, at para. 38. Thus, say plaintiffs, they have adequately alleged that defendants are "sellers," as that term is used in section 12(a) of the Securities Act.

The Court of Appeals for the First Circuit recently addressed this issue in detail in an opinion that undermines plaintiffs' claims. See Shaw v. Digital Equipment Corp., 82 F.3d 1194 (1st Cir. 1996). The Shaw court first observed that, in a firm commitment offering, there is a material distinction between an "issuer" and a "seller" of stock:

> In a firm commitment underwriting, the issuer of the securities sells all of the shares to be offered to one or more underwriters, at some discount from the offering price. Investors thus purchase shares in the offering directly from the underwriters (or broker-dealers who purchase from the underwriters), not directly from the issuer.

Id., at 1215. Such was the case here: although defendants were plainly "issuers" of the stock in question, plaintiffs do not allege that they purchased shares of Omtool directly from any one or more of the defendants.

Given the manner in which a "firm commitment" offering is structured, the Shaw court concluded that, at least ordinarily, corporate officers and directors are not "sellers" under section 12(a).

20

> Because the issuer in a firm commitment underwriting does not pass title to the securities, [the corporate defendant] and its officers cannot be held liable as "sellers" under Section 12(2), unless they actively "solicited" the plaintiffs' purchase of securities to further their own financial motives, in the manner of a broker or a vendor's agent. Absent such solicitation, [the corporate defendant] can be viewed as no more than a "seller's seller," whom plaintiffs would have no right to sue under Section 12(2).

Id.


In an effort to save count 2 of the amended complaint from dismissal, plaintiffs claim that defendants "solicited" their purchases of Omtool stock by virtue of having participated in the preparation of the Prospectus. The Shaw court, however, rejected just such an argument, reasoning that "neither involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone, demonstrates the kind of relationship between defendant and plaintiff that could establish statutory seller status." Id., at 1216 (emphasis in original) (citing Pinter v. Dahl, 486 U.S. 622, 650-51 (1988)).

21

While the amended complaint asserts that defendants "solicited the sale of Omtool common stock" and were "motivated by financial gain" to sell those shares, id., at para. 38, such general and conclusory assertions are insufficient to state a viable claim against defendants under section 12(a)(2). To impose liability on defendants, plaintiffs must plead and demonstrate that defendants acted as something more than simply a "seller's seller." Shaw, 82 F.3d at 1215. That is to say, plaintiff's must point to more than simply defendants' sale of stock to the underwriters of the IPO: they must demonstrate that there was some sort of relationship between plaintiffs and defendants and that defendants "actively solicited" plaintiffs' purchases of Omtool common stock. The amended complaint fails to allege such "active solicitation." There are, for example, no allegations that plaintiffs had any contact whatsoever with any of the defendants, or received any "solicitations" from them (apart from the Prospectus). Consequently, count 2 of the amended complaint fails to state a viable claim against defendants under section 12(a)(2) of the Securities Act.

22

IV.   Pleading Requirements and Allegations of Fraud.

Finally, defendants assert that plaintiffs' amended complaint fails to plead allegations of fraud under section 10(b) of the Exchange Act with sufficient specificity.  And, while they acknowledge that fraud is not an element of claims under either section 11 or 12(a)(2) of the Securities Act, they say that because plaintiffs' claims under those sections "sound in fraud," they are subject to the more rigorous pleading standards applicable to fraud claims.

Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  In the securities fraud context, the complaint must also "set forth specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading.  The rule requires that the particular times, dates, places or other details of the alleged fraudulent involvement of the actors be alleged."  Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994) (citation and

23

internal quotation marks omitted).  See generally 15 U.S.C.

§ 78u-4(b)(1) ("In any private action arising under this chapter

in which the plaintiff alleges that the defendant [engaged in

fraud] . . . , the complaint shall specify each statement alleged

to have been misleading, the reason or reasons why the statement

is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, the complaint shall

state with particularity all facts on which that belief is

formed.").  The Court of Appeals for the First Circuit "has been

notably strict and rigorous in applying the Rule 9(b) standard in

securities fraud actions."  Greebel v. FTP Software, Inc., 194

F.3d 185, 193 (1st Cir. 1999).  Consequently, it has held that

"inferences of scienter survive a motion to dismiss only if they

are both reasonable and 'strong' inferences."  Id., at 195-96.

Here, the amended complaint alleges fraud with sufficient

specificity to meet the rigorous pleading standards imposed by

Rule 9(b) and 15 U.S.C. § 78u-4.  For example, the amended

complaint contains detailed and specific claims regarding sales

that Omtool made to "Customer Three" that were, allegedly,

24

fictitious and with regard to which Customer Three had no payment obligations. See Amended complaint, paras. 61-66. The amended complaint also alleges that a fictitious sale of $250,000 was made to Customer Four, based upon false statements that Omtool had a "hot order" for a substantial purchase from the Social Security Administration. That sale (apparently to be consummated through Customer Four) never materialized and plaintiffs allege that when Customer Four subsequently attempted to confirm the order with the Social Security Administration, it was told that the Administration was "not aware of any such order." Amended complaint, para. 74. The amended complaint alleges that nevertheless, Omtool improperly recognized $250,000 in revenue as a result of that "transaction." Amended complaint, para. 76.

To be sure, the court of appeals has, under somewhat similar circumstances, concluded that a complaint like plaintiffs', alleging "channel stuffing" and deviations from generally accepted accounting principles ("GAPP"), failed to plead fraud with sufficient specificity. See Greebel, supra. In this case, however, the allegedly improper sales and accounting practices:

25

(1) are alleged with greater specificity; and, if true, (2) had a far more substantial impact on the company's bottom line. According to plaintiffs' complaint, those improprieties caused Omtool to overstate its net income by as much as 69% for the quarter ending December 31, 1997, and by as much as 338% for the quarter ending June 30, 1998. See Amended complaint at paras. 52 and 76. Compare Greebel, 194 F.3d at 206 ("At best, plaintiffs' additional evidence supports an inference that [defendant] improperly recognized from $416,000 to $1.55 million in revenue in the third quarter of 1995. Because [defendant] reported overall revenue during the quarter of $37.1 million, these transactions do not support a strong inference of scienter. It is equally possible to conclude that [defendant] made some incorrect accounting decisions regarding a limited number of transactions."). In this case, however, the magnitude of the allegedly improper accounting practices (as a percentage of Omtool's total revenue) undermines the reasonableness of any inference that Omtool simply "made some incorrect accounting decisions regarding a limited number of transactions," id., and, instead, supports a strong inference of scienter. See generally

26

<u>Schaffer v. Timberland Co.</u>, 924 F. Supp. 1298, 1318-22 (D.N.H. 1996).

## Conclusion

In light of the foregoing, defendants' motion to dismiss (document no. 34) is granted in part and denied in part. Count 2 of plaintiffs' amended complaint (alleging violations of section 12(a)(2) of the Securities Act) is dismissed for failing to adequately allege that defendants were "sellers" of securities. In all other respects, however, defendants' motion is denied.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 14, 2000

cc:  David P. Slawsky, Esq.
     Janine R. Azrilliant, Esq.
     Richard B. Drubel, Esq.
     Francis J. Farina, Esq.
     James P. Bassett, Esq.
     Patricia R. Ray, Esq.